Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JEFFREY S., individually and on behalf of S.S. a minor,<br><br>        Plaintiff,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD HEALTHCARE PLAN of GEORGIA d/b/a ANTHEM BLUE CROSS BLUE SHIELD, and the GRAPHIC PACKAGING INTERNATIONAL HEALTHPLUS HSA MEDICAL PLAN,<br><br>        Defendants. | COMPLAINT<br>Civil Case No. 1:24-cv-00147 |

Plaintiff Jeffrey S. ("Jeff") individually and on behalf of S.S. a minor, through his

undersigned counsel, complains and alleges against Defendants Anthem Blue Cross Blue Shield

Healthcare Plan of Georgia d/b/a Anthem Blue Cross Blue Shield ("Anthem") and the Graphic

Packaging International Healthplus HSA Medical Plan ("the Plan") as follows:

//

1

## PARTIES, JURISDICTION AND VENUE

1. Jeff and S.S. are natural persons residing in Broomfield County, Colorado. Jeff is S.S.'s father.

2. Anthem is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Jeff was a participant in the Plan and S.S. was a beneficiary of the Plan at all relevant times. Jeff and S.S. continue to be participants and beneficiaries of the Plan.

4. S.S. received medical care and treatment at Viewpoint Center ("Viewpoint") from October 1, 2022, to December 6, 2022, and Open Sky ("Open Sky") from December 7, 2022, to March 8, 2023, and again from September 5, 2023, through October 2, 2023. During the timeframe at issue, these were treatment facilities which provided sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. Viewpoint is in Davis County Utah, and Open Sky has campuses in Utah and Colorado.

5. Anthem denied claims for payment of S.S.'s medical expenses in connection with her treatment at Open Sky, and while it paid for a portion of S.S.'s treatment at Viewpoint, it paid at an artificially reduced rate without adequately divulging its methodology or reasoning for doing so.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah through its network of affiliates, and the treatment at issue took place in Utah.

8. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs he will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and S.S.'s privacy will be preserved.

9. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### S.S.'s Developmental History and Medical Background

10. S.S. has a family history of various mental health conditions including borderline personality disorder, bipolar disorder, anxiety, panic attacks, and completed suicides.

11. Even as a child, S.S. was often resistant to instructions and didn't like being told what to do. She would get upset and would throw temper tantrums well beyond the age where this would have been considered normal or appropriate.

12. S.S. was very outgoing and tended to make friends easily. Although she was happy as a younger child, by the time that she was in the fourth or fifth grade, she stated that she was experiencing depression. S.S. also had her first concussion around this time after colliding with a boy while playing sports.

13. When she was in sixth grade an anonymous "Safe2Tell"[1] call was made claiming that S.S. was suicidal. The police responded and S.S. was hospitalized and then began receiving treatment at the partial hospitalization level of care.

14. S.S. received neuropsychological testing at the time and was diagnosed with ADHD, depression, and anxiety. S.S. started regularly meeting with a psychiatrist and a therapist. She also began taking medications, was placed on a 504 plan at school, and began meeting with an executive functioning coach.

15. S.S. often acted impulsively and was caught sharing personal information and photos with strangers online. On one occasion, while taking horseback riding lessons, S.S. claimed that she accidentally cut herself on a pole while riding. The cut required multiple stitches to close.

16. S.S.'s story, however, was not consistent with the evidence but she nevertheless continued to claim that she had hurt herself while riding. S.S. even cut her jeans afterwards to make her story seem more plausible. Several months later S.S. confessed that she had, in fact, not had an accident while horseback riding but had intentionally self-harmed by cutting.

---

[1] Safe2Tell is a service available in Colorado where concerned individuals can call and anonymously report dangerous or concerning behaviors to an operator who will pass this information on to the appropriate authorities.

17. S.S. continued to engage in acts of self-harm and was again hospitalized and had her medications adjusted. S.S. again began attending a partial hospitalization program. Rather than helping S.S., she adopted some of the bad behaviors from others on the program and for instance, began scratching herself aggressively and continued to voice suicidal ideation. S.S. was hospitalized after she threatened to run into traffic, after which she again was placed in a partial hospitalization program.

18. S.S. went to a Halloween party and after returning home was again hospitalized following another Safe2Tell report which resulted in an interview with the police. S.S. was discharged from the hospital, but was readmitted two days later, and then readmitted again two weeks later. S.S. began to express thoughts of gender dysphoria and was discovered to be abusing substances.

19. On November 30, 2021, S.S. self-harmed with a razor to the point that she needed stitches and was again hospitalized and was admitted to a facility called Centennial Peaks. Shortly after her discharge, S.S. lied to her parents and went to a local grocery store where she bought a pack of razors and again self-harmed, this time needing about thirty stitches (which she later pulled out while in inpatient care). She was again hospitalized.

20. S.S. was hospitalized again a few months later and continued to voice suicidal ideation. S.S.'s parents came to the realization that any time S.S. had any kind of significant stressor in her life, she coped by resorting to self-harm and hospitalization. Numerous attempts at treatment, both inpatient and outpatient, as well as multiple medications had been unsuccessful. Consequently, S.S. was admitted to Viewpoint with Anthem's approval.

**Viewpoint**

21. S.S. was admitted to Viewpoint on October 1, 2022.

22. In a series of Explanation of Benefits statements Anthem approved S.S.'s treatment at Viewpoint but reduced the allowed amount to $464 per day or 33.1% of the billed charges, citing to an adjustment based on the maximum allowed amount.

23. On May 16, 2023, Jeff submitted an appeal regarding the reduced payment for S.S.'s treatment at Viewpoint. Jeff wrote that according to the provisions of his benefits booklet, the maximum allowable amount Anthem would pay was calculated based on the lesser of a provider's normal charge for a similar service, or the reasonable and customary allowance for a service which was calculated by assessing the usual charge billed by other providers in the same geographic area for similar services.

24. Jeff argued that Viewpoint billed a daily amount that was typical among similar providers in the area. He produced a table which outlined the billed costs for sixteen different facilities and stated that the average amount billed among these was $1400.19 per day, and that when only the hospital-based facilities most comparable to Viewpoint were included, the average amount increased to $2109.00 per day.

25. Jeff wrote that Viewpoint's charges were comparable to other similar residential programs in the state of Utah and should have been fully paid by Anthem.

26. Jeff asked Anthem to divulge "with clear and detailed documentation describing the exact methodology" the process Anthem relied upon to calculate the allowed amount for each of S.S.'s claims even if Anthem considered this information to be proprietary.

27. He stated that he was entitled to this information under ERISA and asked Anthem to explain in detail exactly how it had arrived at the $464 daily amount it had authorized.

28. Jeff expressed concern that the denial of payment constituted a violation of MHPAEA as well and asked Anthem to perform a MHPAEA compliance analysis on the Plan. He asked for a copy of this analysis and any documentation used, including the methodology Anthem employed for calculating allowed amounts for both intermediate level behavioral health and intermediate level medical and surgical services.

29. In addition Jeff asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

30. In a letter dated September 15, 2023,[2] Anthem upheld the reduction of payment for S.S.'s treatment at Viewpoint. The letter stated that the claims had been processed correctly and that:

> I understand an appeal was requested because you stated that the above claims were processed incorrectly. You stated that the Explanation of Benefits indicated that the maximum allowed amount to only $464.00 per day. You stated that you have found the average amount billed is $1,400.19 per day. You are requesting Anthem reprocess the claims at 100% of billed charges. You are requesting justification of the allowance of $464.00 per day. Based on the information provided, I am unable to change the previous coverage decision.

---

[2] This letter referenced multiple claims, including those from November 1, 2022, through November 30, 2022. Anthem sent a revised letter dated October 11, 2023, which seems to be largely identical to the September 15, 2023, letter except that it omitted the November claims and dates. The revised letter did not specify why this was done.

After careful review, we have found that the claims associated with the above listed date of services have been processed correctly according to your plan benefits. We process claims based upon the charges submitted to us by the providers of service and the benefits under your plan. This provider is not considered in-network with your plan. The claim has been processed at your out-of-network level of benefits based upon the maximum allowed amount. Payment for these services is subject to your annual deductible under your major medical benefits. Since your annual deductible had not been satisfied prior to the claims being processed, the maximum allowed amount, plus 70% coinsurance was correctly applied. You will still be responsible for the charges over the maximum allowed amount as this provider is not contracted with us and we cannot require them to write these charges off. You may contact the provider of service and try to negotiate a discount with them, but they are not required to do so. We will not consider payment on charges over the maximum allowed amount. We cannot override the benefits under your plan and no additional payment will be made on these claims.

To provide you with a better understanding of Anthem's position on this matter, please refer to page 3 of the Graphic Packaging International Summary Plan Description HealthPlus HSA Medical Plan dated January 1, 2021, in the section titled "Schedule of Benefits," which states:

**Maximum Allowed Amount**

Benefits under the plan are based on the plan's "maximum allowed amount" for covered services and supplies.

**MEDICAL SERVICES AND SUPPLIES**

Anthem BCBS determines whether a medical service or supply is within the maximum allowed amount.

• **For providers who are in-network**, the maximum allowed amount is based on the contractual agreement between Anthem BCBS and the provider.

• **For providers who are out-of-network**, the maximum allowed amount is based on the lesser of:

– The provider's normal charge for a similar service or supply.
– The reasonable and customary allowance for the service. For a charge to be considered reasonable and customary, the charge may not exceed the usual charge billed by other health care providers in the geographic area for similar services and supplies, as determined by Anthem BCBS. Consideration is given for unusual circumstances or complications that require additional time, skills or experience.

Anthem BCBS compiles the information and makes this determination.

You are responsible for any charges that are more than the maximum allowed amount. These additional amounts do not count toward your deductible or out-of-pocket maximum but may be eligible for reimbursement from your HSA.

31. Anthem did not produce the documentation Jeff requested including any information on how it calculated the amount it would pay for S.S.'s treatment.

32. While S.S. made progress at Viewpoint, she continued to exhibit troubling behaviors even while she was being closely monitored in treatment such as self-harming by pulling out fingernails and toenails, getting into violent altercations with staff, voicing suicidal ideation, and scratching herself. Her treatment team recommended further care following her discharge, and she was admitted to Open Sky.

**Open Sky**

33. S.S. was admitted to Open Sky on December 7, 2022.

34. In a letter dated September 6, 2023, Anthem denied payment for S.S.'s treatment at Open Sky. The letter stated that the service was "excluded or not covered" as it was a:

Wilderness Program A request for payment for a Wilderness Program has been received and administratively denied. Our records indicate that the requested service is not a covered benefit based on the coverage as described in the members [sic] benefit plan certificate booklet. Specifically, the Level of Care requested is not a covered benefit under the members [sic] contract. The final decision to proceed with the requested service is between the provider and the member.

35. On December 11, 2023, S.S.'s mother submitted an appeal of the denial of payment for S.S.'s treatment at Open Sky during both admissions. She wrote that she was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information she provided, and which

gave her the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave her the information necessary to perfect the claim.

36. She asked that the reviewer be knowledgeable about generally accepted standards and clinical best practices for outdoor behavioral health programs in the state of Utah and that they be trained in the details of MHPAEA to meaningfully respond to her concerns about a violation of the statute.

37. She wrote that in addition to the above denial letter, she had received Explanation of Benefits statements which also stated that the service was not authorized and the facility was out-of-network.

38. She wrote that despite Anthem's contention that they were excluded, outdoor behavioral health programs were not listed under the "What is Not Covered Under the Plan" section of her benefits booklet.

39. She expressed concern that Anthem's denial was a violation of MHPAEA. She wrote that MHPAEA compelled insurers to ensure that benefits for behavioral health services were offered at parity with benefits for medical or surgical services in the same classification. She identified skilled nursing, subacute rehabilitation, and inpatient hospice facilities as some of the medical or surgical analogues to the treatment S.S. received.

40. She voiced her belief that Anthem was imposing a restriction on S.S.'s treatment based on facility type in violation of MHPAEA as it was denying payment for services rendered even though Open Sky met all the necessary requirements for care to be approved and was not an excluded service in the actual plan terms.

41. She asked that if Anthem categorically denied payment for any analogous medical or surgical services regardless of any applicable contractual provisions that it produce evidence of it doing so. She also requested that it perform a MHPAEA compliance analysis to ensure the Plan was operating in accordance with the statute and asked to be provided with physical copies of the results and all documentation used.

42. She argued that outdoor behavioral health facilities had been thoroughly researched and had been proven to be safe and effective. She included documentation to support this assertion including peer reviewed articles and letters from a variety of professionals including clinicians and external review agencies.

43. She included copies of S.S.'s medical records with the appeal to further attest to S.S.'s need for treatment and again asked for a copy of the Plan Documents.

44. In a letter dated February 26, 2024, Anthem upheld the denial of payment for S.S.'s treatment at Open Sky. The letter stated in pertinent part:

> After careful review, the denial of wilderness therapy at Open Sky Wilderness Therapy for dates of service September 5, 2023, through October 2, 2023, due to wilderness therapy not being a covered benefit has been upheld. Wilderness therapy is not listed as a covered benefit in your Graphic Packaging International Summary Plan Description.
>
> On page 53 of you [sic] Graphic Packaging International Summary Plan Description, under the heading, "What is Not Covered Under the Plan", it states:
>
> Any other charges or services not specifically listed as a covered expense.
>
> [Your mother] is contesting that your policy does not allow for the treatment of wilderness therapy and raised concerns that the decision violates the Mental Health Parity and Addiction Equity Act (MHPAEA) and NQTL's (Non-Quantitative Treatment Limitations). Your plan is not imposing nonquantitative treatment limitations (NQTLs) and is not violating Mental Health Parity and Addiction Equity Act (MHPAEA). Your policy is self-insured and the employer group chooses which treatments it will cover. Wilderness therapy is not listed as a covered benefit in your Graphic Packaging International Summary Plan

Description. I have enclosed additional information regarding our non-quantitative treatment limitations analysis for your records.

Lastly, [your mother] made a request for a copy of all documents under which the plan is operated, the certificate of coverage, criteria and guidelines used for the benefits you are seeking and all reports from physicians. We are happy to provide this information and will be mailed under a separate cover.

45. The letter included a document titled NQTL SELF COMPLIANCE TOOL, a two page document which discussed non-quantitative treatment limitations generally as well as some of the steps Anthem had taken to minimize them. It did not address any specific concerns raised in the appeals.

46. The Plaintiff exhausted his pre-litigation appeal obligations under the terms of the Plan and ERISA.

47. The denial of benefits for S.S.'s treatment was a breach of contract and caused Jeff to incur medical expenses that should have been paid by the Plan in an amount totaling over $150,000.

**FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

48. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

49. Anthem and the Plan failed to provide coverage for S.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

50. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

51. The denial letters produced by Anthem do little to elucidate whether Anthem conducted a meaningful analysis of the Plaintiff's appeals or whether it provided him with the "full and fair review" to which he is entitled.

52. Anthem failed to substantively respond to the issues presented in Jeff's appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process, nor did it provide documentation detailing how it had calculated the allowed amount for the services at Viewpoint.

53. Anthem and the agents of the Plan breached their fiduciary duties to S.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in S.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of S.S.'s claims.

54. The actions of Anthem and the Plan in failing to provide coverage for S.S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity and program eligibility criteria.

55. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

56. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

57. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

58. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

59. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

60. The criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

61. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for S.S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

62. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

63. Anthem and the Plan evaluated S.S.'s mental health claims using criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

64. The level of care applied by Anthem failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

65. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

66. Anthem denied S.S.'s outdoor behavioral health treatment based on an alleged plan exclusion. The National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

67. Plaintiff is aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by Anthem.

68. Moreover, the Plaintiff wrote that they were unable to find any contractual language discussing the exclusion Anthem alleged was in effect. On information and belief, Plaintiff asserts that Anthem does not deny payment for analogous medical or surgical services which are not excluded under relevant contractual language or plan provisions.

69. Jeff also voiced concern that Anthem was applying disparate billing practices for residential care as opposed to analogous medical or surgical care. He asked for additional information to allege this and his other claims concerning MHPAEA with more specificity, but Anthem refused or failed to provide it.

70. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

71. Anthem and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that Anthem and the Plan were not in compliance with MHPAEA.

72. In fact, despite Jeff's request that Anthem and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Anthem and the Plan have not

provided Jeff with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Anthem and the Plan have not provided Jeff with any information about the results of this analysis.

73. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for his loss arising out of the Defendants' violation of MHPAEA.

74. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for S.S.'s medically necessary treatment at Viewpoint and Open Sky under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 13th day of September, 2024.

By     s/ Brian S. King
        Brian S. King
        Attorney for Plaintiff

County of Plaintiff's Residence:
Broomfield County, Colorado.